**NATIONAL DAIRY PRODUCTS CORPORATION, Plaintiff,**

v.

**The SWISS COLONY, INC., Defendant.**

**NATIONAL DAIRY PRODUCTS CORPORATION, Plaintiff,**

v.

**JEFFREY CHEESE CO., INC., Defendant.**

**NATIONAL DAIRY PRODUCTS CORPORATION, Plaintiff,**

v.

**ARMOUR AND COMPANY, Defendant.**

**Civ. A. Nos. 3555, 3637, 3639.**

United States District Court,
W. D. Wisconsin.

Dec. 29, 1972.

---

John L. Bruemmer, Madison, Wis., C. Lee Cook, Jr., Chicago, Ill., Edwin Luedeka, Knoxville, Tenn., for National Dairy Products Corp., plaintiff.

Joseph P. House, Jr., Milwaukee, Wis., for The Swiss Colony, Inc., defendant.

Charles F. Meroni, Chicago, Ill., Blum & Blum, Monroe, Wis., Roland B. Day, Madison, Wis., for Jeffrey Cheese Co., Inc., defendant.

Joseph A. Melli, Madison, Wis., Jerome F. Fallon, Chicago, Ill., for Armour and Co., defendant.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

I find as fact those matters set forth in the Section of this opinion headed "facts."

## FACTS

National Dairy Products Corporation (now by change of name Kraftco Corporation), a corporation of Delaware having an office and place of business at 500 Peshtigo Court, Chicago, Illinois, is plaintiff in all of the above actions.

Kraft Foods Company was a corporation organized under the laws of the State of Delaware until May 31, 1957. On that date Kraft Foods Company was merged with National Dairy Products Corporation and the business of Kraft Foods Company has since been carried on by the Kraft Foods Division of National Dairy Products Corporation or by the Kraft Foods Division of Kraftco Corporation. In this action, reference to "Kraft" refers to the Kraft Foods Division of National Dairy Products Corporation (now Kraftco Corporation) or its predecessor Kraft Foods Company.

The Swiss Colony, Inc., a corporation of Wisconsin having an office and place of business at Monroe, Wisconsin, is defendant in Civil Action No. 3555.

Jeffrey Cheese Co., Inc., a corporation of Wisconsin having an office and place of business at Monroe, Wisconsin, is defendant in Civil Action No. 3637.

Armour and Company, a corporation of Delaware having offices and places of business at Monroe and Portage, Wisconsin, is defendant in Civil Action No. 3639.

These are three separate actions for infringement of United States Letters Patent No. 2,919,990, which have been consolidated for trial on all issues. Jurisdiction is conferred under 35 U.S.C. Sections 271, 281 et seq., and the parties have stipulated that venue is proper.

The patent in suit is United States Letters Patent No. 2,919,990 entitled "Method of Continuously Producing Packaged Units" issued to National Dairy Products Corporation on January 5, 1960, from an application filed on June 22, 1955, by Harry G. Podlesak, George Howard Kraft and Roland E. Miller, and all six method claims of the patent are in suit.

Plaintiff is the legal owner of Podlesak et al. Patent No. 2,919,990 and all rights of action thereunder.

The patent here in suit has been the subject of previous litigation. Actions for infringement of the patent in suit were filed by plaintiff in the United States District Court for the Eastern District of Wisconsin against the Borden Company and Hayssen Manufacturing Company (63 C 74); Safeway Stores Incorporated and Hayssen Manufacturing Company (63 C 113); Frigo Brothers Cheese Corporation and Hayssen Manufacturing Company (63 C 114); Frank Ryser Wisconsin Co. and Hayssen Manufacturing Company (63 C 115); L. D. Schreiber Co., Inc., L. D. Schreiber Cheese Co., Inc. and Hayssen Manufacturing Company (63 C 116); and Concord Cheese Corporation and Hayssen Manufacturing Company (63 C 117). These actions were consolidated for trial in the Eastern District on the issues of validity and title.

Civil Action No. 63 C 115, National Dairy Products Corporation v. Frank Ryser Wisconsin Co., et al. was settled on October 15, 1965, prior to trial in the Eastern District of Wisconsin by a consent decree which enjoined Frank Ryser Wisconsin Company from infringing the Podlesak patent.

Civil Actions Nos. 63 C 74, 63 C 113, 63 C 114, 63 C 116, and 63 C 117 were tried in April, 1966 in the Eastern District of Wisconsin. The issue of validity was considered by District Judge Grubb, who held that the patented method was obvious to one having ordinary skill in the art and that the patent was therefore invalid under 35 U.S.C. § 103; he rejected all other defenses raised by the defendants in those cases. 261 F. Supp. 771 (E.D.Wis.1966). The Court of Appeals reversed Judge Grubb's con-

clusion on the issue of obviousness, and held that the patented method was not obvious and that the patent was valid, 394 F.2d 887 (7th Cir. 1968). Petitions for a rehearing were denied, as was a petition for writ of certiorari, 393 U.S. 953, 89 S.Ct. 378, 21 L.Ed.2d 364 (1968).

After certiorari was denied, Safeway Stores Incorporated, defendant in 63 C 113, on July 24, 1969, entered into a consent judgment in the Eastern District that the patent here in suit is valid and was infringed by Safeway. Safeway paid plaintiff $250,000.00 for past infringements and entered into a license agreement for the future, agreeing to pay plaintiff one-half cent per pound for cheese packaged in accordance with the method of the patent. Under the license Safeway paid Kraft $53,940.00 in royalties between May 1, 1969 and September 7, 1969.

Suit for infringement of the Podlesak et al. patent was also brought by plaintiff against Green County Pre-Pak Inc. in this District (Civil Action No. 3638). On December 19, 1969, this Court entered a consent judgment that the patent is valid and was infringed and enjoined Green County Pre-Pak Inc. from using the methods claimed in the patent. Under the settlement, Green County Pre-Pak Inc. paid plaintiff $18,000.00 for past infringement and entered into a license agreement providing for a royalty of one-half cent per pound of cheese packaged by the patented method.

The Podlesak et al. patent in suit, relates to the art of packaging and, more particularly, to a method for wrapping an article in a sealable flexible sheet material. The alleged invention is directed to the packaging of all sorts of materials, but has particular application to the packaging of food products and the like, such as cheese, which are susceptible to mold growth, and most particular application to the packaging of sliced natural Swiss cheese.

All of the defendants in this action are engaged in the packaging of cheese, and the processes alleged to infringe all relate to the packaging of cheese.

One of the primary problems in packaging cheese is that it dries out and molds. Natural cheese is a constantly changing product carrying live mold spires, yeast and bacteria throughout and it is quite susceptible to visible molding, particularly on surfaces exposed to air. Visible mold on cheese renders it unsaleable and, without preventive measures, mold will become visible on cheese within a week or ten days, which is too short a time for modern marketing conditions.

Prior to the alleged invention of the patent in suit, it was known that mold could be prevented or controlled by one or more of the following expedients: (1) sterilization of the cheese (which is generally referred to as processing), (2) the use of chemicals known as antimycotics either on the surface of, or in, the cheese, and (3) the elimination of oxygen, the presence of which is necessary to permit mold to grow.

Process cheese, i. e., natural cheese which has been melted and cooked at high temperatures in order to prolong its shelf life, was packaged prior to 1954, the year of the alleged invention in suit, by pouring it into an air-tight container while hot; as a result, mold did not grow because the cheese was sterile and conditions necessary for mold growth were not present. Process cheese was also cut into blocks or slices after cooling. This product was subject to molding and efforts to package it generally included the addition of antimycotics to the melted cheese during processing, or incorporating antimycotics in the surface of the wrapper, which could be subsequently pressed against the generally smooth surface of the process cheese.

Because antimycotics could not be incorporated into natural cheese as they could into process cheese, efforts to use them in packaging natural cheese were limited to die cut pieces having a relatively smooth surface into intimate contact with which an antimycotic bearing

wrapper could be pressed. Antimycotic wrappers were not successful for use on natural Swiss cheese or other natural cheeses which had surface voids or irregularities.

Efforts had been made to package natural cheese beginning in the early 1930's. These attempts involved various procedures including placing the cheese in airtight cans or jars, densifying or compressing the cheese under heavy pressure so that smooth surfaces would be obtained which would enable the cheese to be more readily wrapped, coating the surface of the piece of natural cheese with sterilized processed cheese, and various other surface heat and chemical treatments. None of these methods was entirely satisfactory.

Prior to about 1948, the efforts within the cheese industry and the packaging industry to package natural cheese were of modest proportions. However, from about 1948 until March and April, 1954, the efforts increased in number and intensity. During this period, various methods were developed, principally pressure packing and vacuum packing, both aimed at eliminating or diminishing the presence of oxygen. Pressure packing and vacuum packing methods continued to be used even after April, 1954; these methods were expensive and inconvenient, and the appearance of the resulting packages was unsatisfactory. During the five or six years prior to March and April, 1954, within the cheese industry it was Kraft which became most anxious to develop improved packaging methods, principally because Kraft had developed a rindless Swiss which lent itself more readily to packaging in a natural state. However, several other companies, including Armour, had genuine cause to desire improved methods of packaging natural cheese and engaged in efforts to find or to develop such methods.

As of March and April, 1954, there was a need, felt by the industry in significant measure for five or six years, for an automated, relatively inexpensive method of packaging natural cheese, which method would produce more attractive packages and which would make possible significantly longer shelf-life.

In 1953, three packaging methods were used by Kraft for natural cheese: The Cry-O-Vac process; the sponge rubber press; and the Flex-Vac machine.

Cry-O-Vac involved a combination of manually filling a package, sucking air from the package, clipping and sealing the package, and then dipping the package in hot water in order to shrink the wrapper around the product; Kraft was using this method to package random cuts or chunks of cheese.

The sponge rubber press was a vertical press operated by air cylinders, with a sponge rubber bed on the bottom, a movable plate on top, and seal bars on the edges; in the closing action of the press, the sponge rubber expelled air from the edges of the hand-filled package, and the seal bars sealed the edges; a packaging material called Parakote was used on the sponge rubber presses and it was treated with an antimycotic; Kraft was using this method to package sliced natural cheese; the packages were wrinkled in appearance; their shelf life was about 10 days to two weeks. Kraft had started its use of such sponge rubber presses in late 1952 or early 1953.

The operation of the Flex-Vac machine, manufactured by Standard Packaging Corporation, involved manually placing a stack of sliced cheese in an individual pouch which was supported within a vacuum chamber while the vacuum was created and the open mouth of the package was sealed.

Finding a better solution to the problems of packaging natural cheese was the task assigned by Kraft Foods Company in about October, 1953 to Podlesak, George Howard Kraft, and Miller, and they worked on it until about April 22, 1954, and beyond. The objectives were principally to automate in order to make it possible to package more natural cheese faster, and to develop a visually

attractive package in which the natural cheese would enjoy a longer shelf-life.

The concept of a so-called roll-stock packaging machine, by which various materials could be continuously packaged automatically rather than singly and manually, was a familiar concept long before 1953. However, the necessity to achieve a minimal oxygen content in each package was the principal practical impediment to the use of a roll-stock machine for packaging natural cheese.

With respect to the oxygen problem, it was also a familiar concept that if cheese could be packaged in an atmosphere of inert gas rather than air, the growth of mold would be inhibited and shelf life increased. Many people had tried methods which sought to combine the benefits of both vacuum and gas, including the defendant Swiss Colony, the defendant Armour, Standard Packaging and Kraft. Some success was achieved by first drawing out the air with vacuum and then refilling the package with gas on a single pouch basis. In such a case, the gas was used to balance the pressures inside and outside of the package after the air was removed by vacuum so that the wrapper would not be drawn down and the package distorted. This process still had many of the disadvantages of the vacuum procedure.

Prior to May 7, 1953, Kraft had experimented with the injection of inert gas into the packages prior to sealing them on the sponge rubber press, to improve the appearance of the packages, and it proceeded to modify its sponge rubber presses to permit such injections.

Subsequent to the initiation of this experimentation with the injection of gas on the sponge rubber presses, one of Kraft's Flex-Vac machines was returned to Standard Packaging in New Jersey in 1953 to be modified, at the request of Kraft, to include a means for relieving the vacuum by releasing gas into the vacuum chamber. In this procedure the vacuum step was the step relied upon to remove the air. Between January 25 and January 29, 1954, G. H. Kraft, Lew-

is Hayhurst, and Frank Coffey, all Kraft Foods personnel, visited New Jersey and observed the operation of the Flex-Vac machine there with a gas-injecting attachment. The Flex-Vac so modified was delivered to Kraft in late February 1954 and Kraft continued to experiment with this machine and eventually put it into commercial use. Relieving the vacuum by the injection of gas overcame the problem of the shriveled-up appearance of the package. The process continued to require pre-formed pouches, manual insertion of the cheese into the pre-formed pouches, and the use of a vacuum in a vacuum chamber; and the package had flared fin seals on all four sides which was considered by some objectionable.

In February, 1954, Hayhurst, who was then supervising Kraft Research, caused a modification to be made in Kraft's existing Cry-O-Vac equipment to provide for the injection of inert gas, also for the purpose of improving the appearance of the package. This work was completed by March 1, 1954.

As early as 1948, Kraft had been using a machine manufactured by the Hudson-Sharp Company, known as a Campbell wrapper. It was being used for the packaging of sliced processed cheese. This was an automated, roll-stock type of machine. Certain numbers of slices of cheese moved through its conveyor system in units; they were enveloped in wrapping material; and the wrapping material was sealed. Problems existed with the operation, including the "ballooning" of packages because of the presence of air within them. Various measures were experimented with to subject the packages to a vacuum process to reduce the air content. In 1949 at a Kraft plant in Green Bay, for one or two days, an attempt was made to accomplish the vacuuming process by inserting a flattened tube, about $5/16$ to $9/16$ of an inch in diameter, longitudinally into the film tube being formed and to draw out air from the tube in this manner. The effort was

unsuccessful because the vacuum tube was brought into contact with the upper surface of the top slice in each unit of cheese, disturbing the position of the cheese within the wrapping material. Some time between 1950 and 1953, Hudson-Sharp furnished Kraft with a Campbell wrapper equipped with a pipe extending down the throat of the film tube; the pipe was for the purpose of injecting air or drawing a vacuum, to control the shape of the sealed area of the package.

Some time between about early 1953 and about April 22, 1954, Hayhurst, as supervisor of Kraft Research, directed an assistant, Coffey, to attempt to introduce an inert gas into the operation of a Hudson-Sharp-Campbell machine by inserting a hose down the throat of the wrapper as it folded over the cheese, as the cheese went into the machine. It is not known whether this occurred before or after Hayhurst, Miller, and G. H. Kraft had observed the operation of the gas-injection attachment to the Flex-Vac machine at Standard Packaging in New Jersey in late January 1954. Hayhurst's purpose in directing Coffey to insert the gas tube into the Hudson-Sharp-Campbell machine was to try to demonstrate that there would be some value in sparging, that is, in introducing quantities of inert gas into the packaging process.

In 1949, Dr. Arthur Swanson, a professor in the Dairy Sciences Department of the University of Wisconsin, had experimented with a certain method of packaging cheese, and he had made a record of the experiment. At the time he was a part-time consultant to defendant herein, Swiss Colony, Dr. Swanson had an idea which involved the use of vacuum, gas and pressure for the packaging of cheese. He made notes of his idea, made a sketch, and disclosed it to his then employers, Messrs. Ray and Forrest Kubly, the owners of The Swiss Colony. To demonstrate his idea to his employers, he made samples by partially enclosing individual pieces of cheese in a sheet of Parakote wrapping material

about 8½ x 11 inches, placing the wrapping material on a table, placing the cheese on it, bringing the sides of the sheet together and making a seal, sealing one end, putting a nozzle at the other end and blowing in gas, then drawing a vacuum, and finally sealing the package. He never reduced any idea to practice or tried any idea except the treatment of individual packages. They all involved vacuum. The only thing ever put into commercial use as a result of Dr. Swanson's work was a process which involved first drawing a vacuum on an individual container, refilling the container with gas and then again drawing a vacuum. Dr. Swanson's idea was abandoned; his notes were placed in his files and maintained there until after this litigation was commenced, at which time they were given to counsel for defendants in these actions and in the actions in the Eastern District cases. In the interim between the time that he first disclosed his ideas to the Kublys and the time suit was brought under the Podlesak patent, he did not disclose his ideas to anyone. He did not apply for a patent on his idea.

From about October, 1953, into early 1954, Podlesak, G. H. Kraft, and Miller made a series of attempts to solve the basic problem of developing a high production rate of attractive packages of natural cheese, with long shelf-life. They commenced with efforts to develop a so-called Toby machine, for packaging meat slices, which Kraft had acquired in September, 1953, and which was capable of forming and sealing two webs into a tube. Commercial Coil, a contract machine builder was enlisted in the effort. An experimental machine evolved. In the course of the evolution, a single web was substituted for the two webs, sponge rubber rollers were added, as was a crimping device. Attempts to use vacuum were made, and then abandoned. Eventually, the introduction of inert gas was undertaken.

By about April 22, 1954, the method of the patent in suit was reduced to practice and the experimental machine

carried it out. It was found that packages produced by the process had a very low oxygen content despite the fact that no vacuuming step was used. The process provided a package with exceptionally good shelf-life without the addition of antimycotics. It saved labor and material costs, and operated at a speed faster than previously available equipment.

The value of the alleged invention was recognized by plaintiff's engineers and production department. Construction of two commercial machines to practice the method was promptly authorized and within a few months the authorization was increased to 20 such machines.

The savings achieved when the patent method was used instead of the Flex-Vac method under comparable conditions were substantial. In the case of the plaintiff, these savings averaged between 3.8¢ to 5.9¢ per pound, and plaintiff's experience was that packaging costs utilizing the Flex-Vac method were between 28 and 44 percent greater than those utilizing the patented method.

The patented method permits savings both in direct labor and in packaging materials. Packaging films for gas packaging cheese were available long prior to 1954. They included Parakote, Polycell, cellophane coated with Pliofilm and other materials. The practice of the method of the patent in suit was possible prior to the availability of so-called "K film." However, the patented method makes possible the use of less expensive wrapping materials because it does not subject the wrapping material to the stresses inherent in a vacuuming operation. It also makes possible the use of packaging material in roll form, which is cheaper than the pre-formed packages which were necessary in the Flex-Vac operation.

The savings achieved by the use of the patented method and its commercial success are directly attributable to that method. It is the practice of the patented method which produces the low oxygen content and the resulting good keeping quality. The experimental machine for practicing the patented method was recognized as achieving substantial savings both in labor and materials. Mechanical improvements which further increased speed were made possible by the basic method.

Plaintiff has constructed 27 machines for practicing the patented method and has packaged millions of pounds of natural cheese by it.

The Podlesak et al. patent in suit teaches a packaging method involving a combination of steps which cause a diluting and sweeping action of a preservative atmosphere or gas over a series of spaced apart units in a packaging material tube. As a result of the flow of gas, the surfaces of the product, any interstices or voids in the surfaces of the product, and any areas of the package where unwanted atmosphere might be trapped, are scrubbed and swept clean leaving essentially only the preservative atmosphere.

In the initial portions of the patent specification, the inventors describe, in general, the problems that they were trying to overcome. They state that in the packaging of cheese and other food products it was possible, prior to the invention, to produce satisfactory packages of cheese on automative packaging equipment as long as the unit to be packaged was of regular shape because then the wrapper could be drawn taut into intimate contact with the product to eliminate air. However, they also explain that with prior methods when the shape of the unit was not regular, pockets were left in the finished package which retained air and permitted mold growth and other deterioration.

The patent sets forth the objects of the invention, among which is "the provision of a method for packaging irregularly shaped objects in such a manner that oxygen retention in voids and pockets is substantially eliminated."

The method of the patent in its broadest aspects is described as including the

disposing of a series of units to be packaged in spaced-apart relationship in an open-ended tube of substantially flexible, sealable sheet material which is also substantially gas and moisture impermeable, and then replacing the air in the tube with a suitable preservative atmosphere by introducing the preservative atmosphere into the tube and causing it to pass over a plurality of units in the tube and out the open end of the tube. The walls of the tube are sealed together between the packaged units to divide the tube into substantially gas tight sections, each enclosing at least one of the units.

The patent also describes the manner of forming a tube containing a number of units to be packaged and points out that best results are obtained when gas is conducted into the tube to fill the tube, whereupon it is forced back through the tube and out its open end by progressively collapsing the tube. The introduction of the gas and the collapsing of the tube cause a sweeping and diluting action which results in the reduction in the content of oxygen or other undesirable gas to a minimum. The patent also points out that desirably the preservative gas is conducted into the body of the tube a distance of several units from the open end of the tube, and there discharged. The patent states that it is possible when employing one commercial embodiment of the alleged invention to obtain oxygen contents below 1.5 percent by volume.

The Podlesak et al. patent teaches that for packaging cheese, nitrogen, carbon dioxide, or mixtures of carbon dioxide and other such non-mold sustaining gases should be used. If products other than cheese are being packaged, the patent provides that a preservative atmosphere suitable for the particular product may be used.

The Podlesak et al. patent also contains a description of a specific wrapping machine "which may be employed for carrying out the method in accord-ance with various of the features of the invention." This detailed description of the machine shown in the patent drawings also generally describes the function of machines which have been used commercially by Kraft since 1954.

Claim 1 of the Podlesak et al. patent is directed to a combination of the following seven steps in a packaging process:

(1) successively disposing a plurality of units to be packaged in spaced-apart relationship in an elongated tube formed of substantially gas impervious, flexible sheet material,

(2) the tube having a single open end,

(3) maintaining a plurality of units in such tube at all times.

(4) continuously introducing a preservative atmosphere into said tube,

(5) progressively, from the non-open end of said tube, collapsing said tube to reduce the volume thereof,

(6) sealing the walls of the tube together between the units to provide substantially gas-tight sections, each enclosing at least one unit,

(7) the introduction of the preservative atmosphere and the collapsing of said tube being effective to cause a portion of the preservative atmosphere to pass over a plurality of units and out the open end of the tube.

Claims 2, 3, 4 and 5 are more limited than claim 1. In addition to the steps contained in claim 1, claim 3 calls for the gas to be released inside the tube at a point in advance of a plurality of units in the tube; claims 2 and 5 call for pressing the sheet material against the units being packaged while the package is being made; claim 5 also calls for the gas to be released within the tube at a point adjacent the point where the tube

is pressed against the units; claim 4 calls for releasing the gas within the tube at a point between the point of tube formation and the point of tube collapse.

Claim 6 is more limited than claims 1 through 5. It calls for all of the steps of claim 1 but adds the following qualifications and steps:

(1) the product being packaged is cheese,

(2) the preservative gas is nitrogen, carbon dioxide or mixtures thereof,

(3) the tube is not only collapsed between the units but pressed against the units being packaged,

(4) the gas is conducted to a point adjacent the point at which the tube is pressed against the units and there released.

Podlesak, Kraft and Miller, the named patentees, were the original inventors of the subject matter disclosed and claimed in the patent in suit.

Each of the steps of the claims is adequately described in the patent specification.

Application claim 1 of the application for the patent in suit sought to claim the invention simply in terms of sealing the walls of the tube together but without limitation to the collapsing step. The Patent Office held that plaintiff was not entitled to such a broad claim, rejecting claim 1 on the basis of patents to Bindszus 2,276,282 and Denison 2,600,216. Plaintiff cancelled application claim 1 and added application claim 16 which required collapsing of the tube as well as sealing of the tube. Collapsing, as well as sealing, continued to be present in the application and in all six of the claims of the patent as issued.

In explaining why applicant was entitled to claims which included both collapsing and sealing, plaintiff explained to the Patent Office that the sealing bars of Denison 2,600,216 and Soubier 2,194,451, which simply closed on the tube to seal it and which necessarily dis-

placed gas from therebetween in the process, could not be construed to perform the collapsing required by the claims in suit. Plaintiff made the following representations and explanations as indicated:

"This patent [Denison] also does not set forth the collapsing of the wrapping tube and the pressing of the material about each of the units."

"The patent [Denison] further does not disclose any means for collapsing and pressing the walls of the tube about the entubed units."

"Further, neither of these primary references [Bindszus and Denison] discloses the collapsing of the tube and the sealing of the tube into individually sealed packages."

"However, neither Denison, Bindszus or Soubier discloses collapsing the wrapper tube and pressing the wrapper material into contact with each of the units to expel gas from the wrapper tube as set forth in the applicant's claims."

Application claim 16 called simply for "replacing the air in said tube with a preservative atmosphere."

In the Eastern District cases, plaintiff contended that the Campbell patent 2,546,731 shows the formation of a film tube with an imperfect longitudinal seal, and that the Swift-Pauly machine made an imperfect longitudinal seal of doubtful effectiveness; plaintiff stressed the significance of the flow of preservative gas back over succeeding units in the tube; plaintiff stressed that in its method the cheese units travel into an increasing concentration of preservative gases; plaintiff contended that in the operation of the Swift-Pauly machine, the gas was released from a jet which was directed against the cheese units before the wrapping material was longitudinally sealed; and plaintiff represented that in the operation of the Swift-Pauly machine gas moved into the packages and made them pillow-like.

Defendants put in evidence in these actions in this court various patents and

publications relating to packaging. These include the following United States patents:

| Patent No. | Inventor | Year of Issuance |
|---|---|---|
| 1,594,794 | Nicolait | 1926 |
| 1,770,379 | Young | 1930 |
| 1,970,193 | Riebel | 1934 |
| 2,113,636 | Vogt | 1938 |
| 2,145,941 | Maxfield | 1939 |
| 2,160,367 | Maxfield | 1939 |
| 2,194,451 | Soubier | 1940 |
| 2,276,282 | Bindszus | 1942 |
| 2,340,260 | Clunan | 1944 |
| 2,370,768 | Baerwald | 1945 |
| 2,432,373 | Bleam et al. | 1947 |
| 2,540,815 | Eldredge | 1951 |
| 2,546,721 | Campbell | 1951 |
| 2,569,217 | Bagdigian | 1951 |
| 2,597,041 | Stokes | 1952 |
| 2,600,216 | Denison | 1952 |
| 2,602,276 | Campbell | 1952 |
| 2,633,684 | Rohdin | 1953 |
| 2,649,671 | Bartelt | 1953 |
| 2,667,420 | Meulemans et al. | 1954 |
| 2,737,000 | McCargar | 1956 (filed 1952) |
| 2,737,764 | Lewis | 1956 (filed 1953) |
| 2,740,243 | Mahaffy | 1956 (filed 1951) |
| 2,753,268 | Ingle et al. | 1956 (filed 1952) |
| 2,753,671 | De Puy et al. | 1956 (filed 1952) |
| 2,778,177 | Mahaffy et al. | 1957 (filed 1953) |
| 2,803,100 | Aalseth | 1957 (filed 1956) |
| 2,808,690 | Mahaffy et al. | 1957 (filed 1953) |
| 2,858,655 | Mahaffy et al. | 1958 (filed 1955) |
| 2,951,324 | Podlesak et al. | 1960 (filed 1956) |
| 2,951,325 | Podlesak et al. | 1960 (filed 1956) |
| 2,955,045 | Coffey et al. | 1960 (filed 1957) (Continuation-in-part of application filed in 1954) |
| 2,976,657 | Cloud | 1961 (filed 1958) |
| 3,090,174 | Kraft | 1963 (filed 1960) |
| 3,274,746 | James et al. | 1966 (filed 1963) |
| 3,024,581 | Cloud | 1962 (filed 1960) |

The following foreign patents:

Coffey (Canadian) No. 599,846 issued 1960

National Dairy Products Corporation (British patent corresponding to the patent in suit) No. 791,425 issued 1958

And the following publications:

Gas Storage of Meats, Food Industries (June, 1936)

Gasometry—For "Sharper" Control of Food Quality, Food Industries (March, 1949)

How Nitrogen Protects the Quality of Foods, Food Industries (September, 1949)

Investigations on the Use of Nitrogen for the Stabilization of Perishable Food Products, Food Technology (April, 1950)

Practical Factors in Nitrogen Packing Using Flexible Film, (Paper read at Forum of the Packaging Institute—October, 1950)

Nitrogen-Packed Cheese in Laminated Cellophane-Polyethylene, Modern Packaging (December, 1954)

Young, Vacuum Packaging Trends, Modern Packaging Encyclopedia (1969)

These patents and publications, either alone or in combination, do not disclose or suggest the process of the claims of the Podlesak et al. patent. Moreover, an ordinary man skilled in the art would not find the Podlesak et al. invention obvious in view of the disclosures of any one or more of these patents and publications. As of approximately April 22, 1954, the alleged invention described in the claims of the patent in suit had not been patented or described in a printed publication in this or a foreign country; nor had the said alleged invention been patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application in the United States for the patent in suit; nor had the said alleged invention been described in a patent granted on an application for patent by another filed in the United States before about April 22, 1954.

Soubier '451 patent was a file wrapper reference and was cited in the Eastern District cases. The patent is relied upon by defendants only for a "pipe extending into a wrapping material tube", and this was shown in the Maxfield '367 patent which was specifically referred to in the opinion of the Court of Appeals (394 F.2d at 889) in the Eastern District cases.

Lewis '764 patent shows the use of resilient rollers to squeeze together progressively two sheets of wrapping material about objects being wrapped. The use of resilient rollers to collapse progressively a wrapping material tube is

shown in Stokes patent '041 which was specifically considered by the Court of Appeals and referred to in its opinion (394 F.2d at 889, n. 4) in the Eastern District cases, and in Clunan '260 patent which was a file history reference and a part of the record in the Eastern District cases.

Campbell '276 patent was not in the prior art before the Court of Appeals in the Eastern District cases. It is relied upon here to show an elongated packaging material tube containing a plurality of units to be packaged. Denison patent '216, which was a file wrapper reference and specifically referred to by the Court of Appeals (394 F.2d at 889, No. 4) in the Eastern District cases, shows the formation of a wrapping material tube and the presence of a plurality of units in the tube. In addition, the Eastern District record contains a drawing stipulated as showing the modified Campbell machines used by plaintiff prior to 1954, and the new Campbell patent shows nothing more than that drawing. Another Campbell patent, No. 2,546,721, was expressly considered by the Court of Appeals (394 F.2d at 889) in the Eastern District cases and was described there as "teach[ing] a method for packaging *multiple units* contained in a continuous tube of wrapping material in individual, closely-fitting wrappers . . ." (394 F.2d at 889) (emphasis by the court).

The unsuccessful efforts prior to about April 22, 1954, within the packaging industry and the food industry to find an automated, relatively inexpensive method of packaging perishable food products, including natural cheese, which method would produce more attractive packages and which would make possible significantly longer shelf-life included, in addition to those previously described in these findings, efforts over a period of years by Standard Packaging Corporation, Stokes and Smith, Cloud Company, Sam Campbell, Hudson-Sharp Company, and Packaging Machinery Corporation. In the period shortly prior to about April 22, 1954,

these efforts continued to be frustrated by the impression that the creation of a partial or complete vacuum was essential to a reduction of oxygen to a permissible level. In this respect, persons other than the applicants for the patent in suit were no more and no less inhibited than the applicants from escaping this impression and from avoiding the necessity of a partial or complete vacuum.

As of approximately April 22, 1954, the alleged invention described in the claims of the patent in suit had not been known or used by others in this country; nor had the said alleged invention been made in this country by another.

Considering the scope and content of the prior art, the differences between the prior art and the claims of the patent in suit, and the level of ordinary skill in the art at that time, the subject matter of the patent in suit as a whole would not have been obvious in the spring of 1954 to a person having ordinary skill in the art to which said subject matter pertains.

### The Hayssen RT Machines Used by Defendants

All of the methods charged to infringe utilized by the defendants have been carried out on machines manufactured and sold by Hayssen Manufacturing Company of Sheboygan, Wisconsin, the machines being designated as Hayssen RT machines. These machines have involved different gas introducing means but all provide a finished package which has a sufficiently low oxygen content to provide a shelf-life satisfactory for commercial distribution.

In operation, all of the Hayssen RT machines used by defendants continuously form a tube of wrapping material from roll-stock, the top of the tube being longitudinally sealed by means of a sealing mechanism. Units of cheese to be packaged are placed upon the sheet material in spaced apart relationship. The transverse sealing mechanism of the Hayssen RT machines consists of a series of scissors-like sets of sealing bars

which are arranged in a "ferris wheel"-like configuration. The scissors-like sets of sealing bars successively and continuously engage the wrapping material tube to pull it through the machine and around the "ferris wheel" arrangement. The action of the sealing bars initially collapses the tube to reduce its volume and then seals the walls of the tube together. Incident to collapsing the tube, the action of the sealing bars, in combination with the tension on the tube, brings the wrapping material into contact with the units of cheese.

The Hayssen RT–1, RT–3, and RT–118 machines whose use is charged to infringe all involve the operation of the "ferris wheel" sealing bar arrangement which functions as described in the previous finding. While the machines varied in other respects, such as the means for introducing the preservative gas, in all of the machines the mode of operation of the transverse sealing mechanism is the same. On all the machines charged to infringe, the defendants have used a flexible sheet material which is substantially gas impervious.

### Defendants' Use of the Gas Pipe Machines

Initially, all three of the defendants herein employed Hayssen RT machines which utilized a gas pipe as the means for introducing the preservative gas. Armour began using such a machine in the latter part of 1959. It was designated as an RT–1 machine. Subsequently, Armour replaced its RT–1 machine with two gas pipe machines designated as RT–3 machines. These machines also utilized a gas pipe. Jeffrey and Swiss Colony each began utilizing a gas pipe machine designated as an RT–1 machine in 1960.

### Findings as to Armour

Armour's Hayssen RT–1 and RT–3 machines utilizing a gas pipe as the means for introducing a preservative gas practiced a method in which a tube was formed from substantially gas impervious flexible sheet material. The tube had a single open end and a plurality of cheese units to be packaged were successively disposed in spaced apart relationship in the tube. A plurality of such units were maintained in the tube at all times. The transverse sealing mechanism progressively collapsed the tube from its closed end to reduce its volume. In combination with the tension on the tube, the transverse sealing mechanism also acted to bring the sheet material into contact with the tops and bottoms of the cheese units being packaged, and it sealed the tube between units to divide the tube into substantially gas tight sections, each enclosing one of said units. Inert gas was continuously introduced into the tube by means of the gas pipe, which released the gas inside the tube in advance of a plurality of units and adjacent the point at which the tube was collapsed and the wrapping material was brought into contact with the units being packaged. In operation, the collapsing of the tube incident to the operation of the transverse sealing mechanism, and the introduction of the gas by the gas pipe, were effective to cause a portion of the preservative gas to pass over a plurality of units and out the open end of the tube.

### Findings as to Swiss Colony

Swiss Colony's Hayssen RT–1 machine utilizing a gas pipe as a means for introducing a preservative gas practiced a method in which a tube was formed from substantially gas impervious flexible sheet material. The tube had a single open end and a plurality of cheese units to be packaged were successively disposed in spaced apart relationship in the tube. A plurality of such units were maintained in the tube at all times. The transverse sealing mechanism progressively collapsed the tube from its closed end to reduce its volume. In combination with the tension on the tube, the transverse sealing mechanism also acted to bring the sheet material into contact with the tops and bottoms of the cheese units being packaged, and it sealed the tube between units to divide the tube

into substantially gas tight sections, each enclosing one of said units. Inert gas was continuously introduced into the tube by means of the gas pipe, which released the gas inside the tube in advance of a plurality of units and adjacent the point at which the tube was collapsed and the wrapping material was brought into contact with the units being packaged. In operation, the collapsing of the tube incident to the operation of the transverse sealing mechanism, and the introduction of the gas by the gas pipe, were effective to cause a portion of the preservative gas to pass over a plurality of units and out the open end of the tube.

### Findings as to Jeffrey

Jeffrey's Hayssen RT–1 machine utilizing a gas pipe as the means for introducing a preservative gas practiced a method in which a tube was formed from substantially gas impervious flexible sheet material. The tube had a single open end and a plurality of cheese units to be packaged were successively disposed in spaced apart relationship in the tube. A plurality of such units were maintained in the tube at all times. The transverse sealing mechanism progressively collapsed the tube from its closed end to reduce its volume. In combination with the tension on the tube, the transverse sealing mechanism also acted to bring the sheet material into contact with the tops and bottoms of the cheese units being packaged, and it sealed the tube between units to divide the tube into substantially gas tight sections, each enclosing one of said units. Inert gas was continuously introduced into the tube by means of either a single pipe or two side-by-side pipes which extended into the wrapping material tube and released the gas inside the tube between the point of tube formation and the point of tube collapse, and at a point in advance of a plurality of units in the tube. The gas pipe (or pipes) on the Jeffrey RT–1 machine were shortened by Jeffrey and did not extend to adjacent the point at which the wrapping

material was brought into contact with the units being packaged. In operation, the collapsing of the tube incident to the operation of the transverse sealing mechanism, and the introduction of the gas by the gas pipe or pipes, were effective to cause a portion of the preservative gas to pass over a plurality of units and out the open end of the tube.

### Jeffrey's Use of Its Hayssen RT Gas Pipe-Suction Pipe Machine

In 1963, Jeffrey discontinued the use of its Hayssen RT–1 gas pipe machine, which was operated as described above, and replaced it with a Hayssen RT–3 machine.

The RT–3 machine was delivered to Jeffrey with a triangular gas manifold and a suction pipe such as is used by Armour on its RT–3 machine and which is described below. However, the manifold was almost immediately removed because it wasted gas.

Instead of using the machine with the manifold and suction pipe as originally delivered, Jeffrey substituted the shortened gas pipe from its RT–1 machine and added a suction pipe which extends about six inches beyond the end of the gas pipe, the inlet end of the suction pipe terminating approximately 23 inches upstream of the point where the sealing bars initially clamp the tube of wrapping material.

In operation, the gas pipe is connected to a source of gas and continuously discharges gas into the wrapping material tube through its downstream end. The outlet end of the suction pipe is connected to a pump which withdraws a portion of the atmosphere from the wrapping material tube through the suction pipe. The withdrawn gas is exhausted to the atmosphere.

The only difference insofar as operation is concerned between Jeffrey's RT–1 machine, the operation of which is described in the previous findings, and Jeffrey's RT–3 machine, is the addition of the suction pipe on the RT–3 which withdraws a portion of the gas from

within the packaging material tube. Jeffrey operates its RT–3 machine in such a manner that the finished packages discharged from the machine have an oxygen content essentially below 2 percent.

Under conditions which will provide an oxygen content of less than 2 percent, the amount of preservative gas being introduced must exceed the amount of atmosphere being withdrawn by at least about 25–35 standard cubic feet per hour.

Under the conditions of operation required to obtain an oxygen content of less than 2 percent on the Jeffrey machine, gas flow is as follows: (1) a portion of the gas flows over a plurality of units between the closed end of the tube and the inlet end of the suction pipe and thence out the open end of the tube through the suction pipe, and (2) a portion of the gas flows from the closed end of the tube in a rearward direction over a plurality of units, past the inlet end of the suction pipe, and out the open end of the tube at the apex of the "V" of the former. In the Jeffrey RT–3 machine with the gas and suction pipes, the tube is progressively collapsed in the same manner as set forth in connection with its gas pipe machine, *supra*, and this collapsing in combination with the introduction of gas causes the flow of gas set forth above.

In the operation of the Jeffrey RT–3 machine there is a plurality of units in the tube at all times; the tube has a single open end; the tube is progressively collapsed from its closed end to reduce its volume; the wrapping material is brought into contact with the units being packaged; the tube is sealed transversely to produce gas tight sections each enclosing at least one unit; and the preservative gas is introduced through the gas pipe inside the tube at a point in advance of a plurality of units in the tube and this point is between the points of tube formation and tube collapse.

## Armour's Use of Its Hayssen RT Machines with the Gas Manifold and Suction Pipe

In 1963, Armour purchased a new Hayssen RT–3 machine which was equipped with a manifold and a suction pipe as the gas supplying means.

Subsequent to the purchase of the aforesaid new Hayssen RT–3 machine, Armour converted its gas pipe machines which were operating as described in previous findings by replacing the gas pipe with a manifold and suction pipe.

The Armour RT–3 machines with the manifold and suction pipe gas supply means include a plexiglass manifold which fits over the V-shaped opening provided by the wings of the former. This arrangement produces a sliding contact between the upper surface of the marginal edges of the film and the bottom marginal edges of the manifold and between the lower surfaces of the marginal edges of the film and the upper surfaces of the wings of the former as the film is drawn into the fin sealer. In addition, a suction pipe extends from a point adjacent the apex of the V of the former to a point adjacent that at which the sealing bars engage the wrapping material tube to collapse it. The manifold is about 24 inches long and includes a series of openings or orifices on its lower surfaces through which gas is continuously directed generally vertically downward. As it moves downward, the gas comes into contact with the cheese units which rest in spaced-apart relationship upon the wrapping film, and the gas comes into contact with the wrapping film, as the cheese units and the wrapping film move downstream, and the gas then flows upstream, downstream, and in all directions. The apex of the V of the former is situated at the downstream end of the manifold. By the action of the manifold, a preservative atmosphere is introduced continuously into an elongated tube having a single open end and formed of substantially gas impervious, flexible sheet material. The said tube is formed, and its

open end is located, at the apex of the V of the former. A plurality of units of cheese is maintained at all times in said tube. When functioning as intended by Armour, the suction pipe during operation continuously withdraws a portion of the atmosphere from within the tube through the downstream end of the suction pipe, and carries the said atmosphere within the pipe to a point upstream from and beyond the open end of the tube.

In Armour's Hayssen RT–3 machines, during operation, the release of gas through the openings in the manifold causes an upstream flow of gas over a plurality of units under the manifold and out the opening beneath, and at the upstream end of, the manifold. This upstream flow of gas is also caused, in part, by the collapsing of the tube through the action of the sealing bars and as a consequence, the introduction of gas and the collapsing of the tube cause a portion of the preservative atmosphere to pass over a plurality of units and out the opening beneath, and at the upstream end of, the manifold.

There is also upstream flow over a plurality of units from the closed or downstream end of the tube to the inlet end of the suction pipe, and then within the pipe to a point upstream from and beyond the open end of the tube.

In the area between the apex of the V of the former and the inlet end of the suction pipe, the flow of gas may be either upstream or downstream depending upon the volume of gas being withdrawn through the suction pipe. In either event, a portion of that gas flows over a plurality of units. That gas which flows upstream leaves the tube freely at the open end of the tube at the apex of the V of the former. That gas which flows downstream and which then enters the inlet end of the suction pipe is carried within the pipe to a point upstream from and beyond the open end of the tube.

In operation, the manifold-suction pipe machines of Armour perform a method in which a tube is formed having a single open end; the tube contains at all times a plurality of units successively disposed therein in a spaced-apart relationship; the tube is progressively collapsed from its non-open end to reduce its volume by the action of the "ferris wheel" RT sealing mechanisms as described *supra*, as well as by the withdrawal of atmosphere through the suction pipe; the sheet material is brought into contact with the cheese units being packaged by the operation of the sealing bars in combination with the tension on the tube; the tube is transversely sealed between the units to provide gas tight sections each enclosing at least one cheese unit; inert gas is continuously introduced into the tube; and a portion of the preservative gas is caused to pass over a plurality of units, and to pass out the open end of the tube either freely or within the suction pipe, incident to the introduction of the gas and the collapsing of the tube.

### Swiss Colony's Use of Its Hayssen RT Machine with the Gas Manifold and Suction Pipe

In *1968*, Switt Colony discontinued the use of its RT–1 gas pipe machine which was operated as described in previous findings and replaced it with a Hayssen RT–118 machine.

Swiss Colony's Hayssen RT–118 machine with the manifold and suction pipe gas supply means included a triangular manifold having the same function as the plastic manifold employed by Armour on its RT–3 machine. However, the RT–118 manifold is made of cast metal rather than plastic and it fits within the V-shaped opening defined by the plates or wings of the former. In the RT–118 machine, the film is formed into a U-shaped trough and its marginal edges extend vertically upwardly and ride in contact with the side walls of the manifold rather than with the bottom surfaces of the manifold as in the case of the Armour RT–3 machine. Means are provided, including rollers and guides, to hold the film in close contact with the side surfaces of the manifold.

The manifold is approximately 22–24 inches long and its lower surface is provided with numerous openings or orifices along its length through which, during operation, the gas is continuously directed generally vertically downward. As it moves downward, the gas comes into contact with the cheese units which rest in spaced-apart relationship upon the wrapping film, and the gas comes into contact with the wrapping film, as the cheese units and the wrapping film move downstream, and the gas then flows upstream, downstream, and in all directions. The apex of the V of the former is situated at the downstream end of the manifold. By the action of the manifold, a preservative atmosphere is introduced continuously into an elongated tube having a single open end and formed of substantially gas impervious, flexible sheet material. The said tube is formed, and its open end is located, at the apex of the V of the former. A suction pipe extends from a point adjacent the apex of the V of the former into the wrapping material tube and terminates with its inlet located at a point sufficiently upstream of the point at which the transverse sealing bar fully engages and closes the downstream end of the tube so as to accommodate there between a plurality of cheese units. When functioning as intended by Swiss Colony, the suction pipe during operation continuously withdraws a portion of the atmosphere from within the tube through the downstream end of the suction pipe, and carries the said atmosphere within the pipe to a point upstream from and beyond the open end of the tube.

There is always an upstream flow from the closed end of the tube to the inlet end of the suction pipe. Because the inlet end of the suction pipe is sufficiently spaced from the closed or downstream end of the tube that a plurality of units being packaged are contained in that space, the introduction of gas and the collapsing of the tube cause a portion of the preservative atmosphere to pass over a plurality of the units in this area, into the inlet end of the suction pipe, and then to pass within the suction pipe to a point upstream from and beyond the open end of the tube.

In Swiss Colony's Hayssen RT–118 machine, during operation, the release of gas through the openings in the manifold causes an upstream flow of gas over a plurality of units under the manifold and out the opening beneath, and at the upstream end of, the manifold. This upstream flow of gas is also caused, in part, by the collapsing of the tube through the action of the sealing bars and, as a consequence, the introduction of gas and the collapsing of the tube cause a portion of the preservative atmosphere to pass over units and out the opening beneath, and at the upstream end of, the manifold.

In the area between the apex of the V of the former and the inlet end of the suction pipe, the flow of gas may be either upstream or downstream, depending upon the volume of gas being withdrawn through the suction pipe. In either event, a portion of that gas flows over a plurality of units. That gas which flows upstream leaves the tube freely at the open end of the tube at the apex of the V of the former. That gas which flows downstream and which then enters the inlet end of the suction pipe is carried within the pipe to a point upstream from and beyond the open end of the tube.

In operation, the manifold-suction pipe machine of Swiss Colony performs a method in which a tube is formed having a single open end; the tube contains at all times a plurality of units successively disposed therein in a spaced-apart relationship; the tube is progressively collapsed from its non-open end to reduce its volume by the action of the "ferris wheel" RT sealing mechanisms as described *supra*, as well as by the withdrawal of atmosphere through the suction pipe; the sheet material is brought into contact with the cheese units being packaged by the operation of the sealing bars in combination with the tension on the tube; the tube is transversely sealed between the units to pro-

vide gas tight sections each enclosing at least one cheese unit; inert gas is continuously introduced into the tube; and a portion of the preservative gas is caused to pass over a plurality of units, and to pass out the open end of the tube either freely or within the suction pipe, incident to the introduction of the gas and the collapsing of the tube.

In the course of their application for the patent in suit, the applicants did not inform the Patent Office of: (a) the events with respect to the pipe affixed to the Hudson-Sharp, Campbell machine (*supra*, p. 139); and (b) Campbell patent number 2,602,276.

In the Eastern District cases, Kraft answered "no" to an interrogatory asking whether Kraft knew of anyone (including itself, but excluding Swift & Co.) having used a Hudson-Sharp-Campbell tube wrapping machine with a fluid or gas suction line attachment in communication with the interior of the plastic film packaging tube.

## OPINION

This court has jurisdiction of the parties to these consolidated actions and of the subject matter thereof. Plaintiff in each of the consolidated actions is the owner of the patent in suit and of all rights of action thereunder.

### *Validity*

■ The patent in suit is presumed valid. The burden is upon the defendants to establish invalidity. The presumption of validity is reenforced with respect to prior art which is no more pertinent than that considered and rejected by the Patent Office.

■ The patent in suit has been held valid by the United States Court of Appeals for the Seventh Circuit. National Dairy Products Corp. v. Borden Co., 394 F.2d 887 (7th Cir. 1968), cert. den., 393 U.S. 953, 89 S.Ct. 378, 21 L. Ed.2d 364 (1968). This holding is binding upon this court in the present consolidated actions unless a different holding is required by new and more persuasive evidence received in the present actions. American Photocopy Equipment Co. v. Rovico, Inc., 384 F.2d 813, 815 (7th Cir. 1967), cert. den., 390 U.S. 945, 88 S.Ct. 1030, 19 L.Ed.2d 1133 (1968). Defendants contend that such new and more persuasive evidence on several points has been received in these actions.

■ Defendants contend that obviousness is shown here, as it was not shown in the Eastern District cases, by new and persuasive detailed evidence about the activities, shortly prior to the reduction to practice of the claimed invention, within the Kraft organization, by Hayhurst and his colleagues and by the applicants for the patent in suit. I have examined the record closely in this respect and have considered this contention with particular care. However, I cannot agree obviousness is established with respect to the method of the patent in suit by reason of the fact that in 1953 and early 1954 various experiments were in progress involving the introduction of preservative gases into various packaging methods. Until the invention of the combination of methods embodied in the patent in suit, efforts to create packages of natural cheese with long shelf-life, rapidly and cheaply and in volume, continued to be thwarted, principally because of the persistent assumption that the creation of a vacuum was essential to low oxygen content. I agree that Kraft's market position afforded it a greater motive than others to solve this problem. But others in the food industry and the packaging industry were also motivated. And within the Kraft organization, had the method of the patent been obvious, the motive to solve the problem was so strong that reduction to practice would not have been delayed until the spring of 1954. I am not at all impressed by the evidence concerning the vacuum or air pipe and the Hudson-Sharp-Campbell wrapper in 1949–1953, even when vagaries in the testimony and documents are resolved most favorably to the defendants; the use of such a device to control ballooning of the package

**152**

and to affect the shape of the sealed area was a far cry from the method of the invention in suit. Arthur Swanson's experiment was more to the point, but it was fragmentary and abortive and fell badly short of responding to the full range of commercial needs. It is true that in this court, as contrasted with the Eastern District cases, there were forcible expressions of opinion by expert witnesses that the method was obvious in 1954. With respect, I cannot credit their testimony on the point in the face of the clear evidence that for a significant period of time many skilled people in many commercial organizations were occupied with the problem to which the method of the patent in suit provided the solution. The commercial success of the invention was inquired into more closely here than in the Eastern District cases, but the efforts of the defendants here have failed to dent plaintiff's solid showing that the method of the patent in suit enjoys significant practical commercial advantages; even if one were to assume that the Hayssen machines, in operations, have not infringed, their commercial use demonstrates that the previous devices, such as the sponge rubber press, Flex-Vac, and Cry-o-vac, left much to be desired. Finally, the new evidence received here concerning the sequence of availability of various packaging materials simply does not demonstrate that the method of the patent in suit, while obvious, was overlooked or was not exploited because of the absence of an appropriate wrapping film.

■ The issue of obviousness or non-obviousness under Section 103 of the patent statute (35 U.S.C. § 103) is to be decided by the Court (1) determining the scope and content of the prior art; (2) ascertaining the differences between the prior art and the claims at issue; and (3) resolving the level of ordinary skill in the pertinent art at the time of the invention. The United States Court of Appeals for the Seventh Circuit has already gone through the steps with respect to the prior art cited in the Eastern District cases and as not-

ed above, that decision is binding in the absence of new and more persuasive evidence. There is no such evidence here.

■ Based upon the tests set forth in the foregoing conclusions, the Podlesak et al. patent, No. 2,919,990, issued by the United States Patent Office on January 5, 1960, and each of the six claims thereof are good and valid in law. The subject matter of each of said six claims was not anticipated under 35 U.S.C. § 102 nor was it obvious under 35 U.S.C. § 103.

*Infringement*

■■ The claims of a patent measure the invention and are determinative on the question of infringement, and a patentee is not limited to the best mode for practicing the patent or to any particular mode for practicing the patent described in the specification or the drawings.

■ Infringement of a method patent is not dependent upon the form of the apparatus used by the infringer to practice the method.

■ Infringement is not avoided by performing two steps of the patented method by a single device or mechanism or by utilizing two mechanisms to accomplish a method step achieved by a single mechanism in the preferred embodiment.

■ An accused infringer does not avoid infringement by practicing the method in an imperfect or less effective way than the inventor.

■ During the period from January 5, 1960, until the time in 1963 when Armour converted its Hayssen RT–1 and RT–3 machines to the manifold and suction pipe arrangement, the operation by Armour of its Hayssen RT–1 and RT–3 machines utilizing a gas pipe as described in the findings, *supra*, constituted an infringement of claims, 1, 3 and 4 of the Podlesak et al. patent in suit.

Although the transverse sealing mechanism progressively collapsed the tube from its closed end to reduce its volume,

the sheet material was not "pressed" against the cheese units being packaged, and therefore, claims 2, 5 and 6 were not infringed. I appreciate that, in combination with the tension on the tube, the transverse sealing mechanism acted to bring the sheet material into contact with the tops and bottoms of the cheese units being packaged, sufficiently firmly to cause the marginal edges of the cheese slices to become compressed. However, if collapsing and pressing are to be construed as distinct phenomena, as the language of the claims compels, this relatively mild and limited contact between the sheet material and the cheese units cannot be considered "pressing." Plaintiff rightly insists that the claims measure the invention and determine the question of infringement, and that the patentee is not limited to the best mode or to any particular mode of practice described in the specifications or drawings. Nevertheless, the meaning of "pressing" is sufficiently elastic to permit attention to the language of the patent as a whole. Viewed in this way, it is clear that "pressing" as used in claims 2, 5 and 6 means bringing to bear upon the sheet material in relation to the cheese units a pushing or thrusting force much more extensive and intensive than that brought to bear in the Armour operation of the Hayssen machines. The Armour operation of its Hayssen RT-1 and RT-3 machines utilizing a gas pipe as described in the findings, *supra*, did not constitute an infringement of claims, 2, 5 and 6 of the Podlesak et al. patent in suit.

From a time in 1960 until a time in 1968, the operation by Swiss Colony of its Hayssen RT-1 machine utilizing a gas pipe as described in the findings, *supra*, constituted an infringement of claims 1, 3 and 4 of the Podlesak et al. patent in suit. The comments made above with respect to the absence of "pressing" in the Armour operation are equally applicable to the Swiss Colony operation. The Swiss Colony operation of its Hayssen RT-1 machine utilizing a gas pipe as described in the findings,

*supra,* did not constitute an infringement of claims 2, 5 and 6 of the Podlesak et al. patent in suit.

From a time in 1960 until a time in 1963, the operation by Jeffrey of its Hayssen RT-1 machine utilizing a gas pipe as described in the findings, *supra,* constituted an infringement of claims 1 and 4 of the Podlesak et al. patent in suit. The comments made above with respect to the absence of "pressing" in the Armour and Swiss Colony operations are equally applicable to the Jeffrey operation. It is conceded by the plaintiff that in the Jeffrey operation the preservative atmosphere was not released at a point inwardly of a plurality of the units disposed within the tube, as required by claim 3, nor released at a point adjacent the point at which the sheet material was pressed against the units being packaged (assuming, for this purpose, that it was so pressed), as required by claims 5 and 6. The operation by Jeffrey of its Hayssen R-1 machine utilizing a gas pipe as described in the findings, *supra,* did not constitute an infringement of claims 2, 3, 5 and 6 of the Podlesak et al. patent in suit.

From a time in 1963 until the time of trial of these consolidated actions, the operation by Jeffrey of its Hayssen RT-3 machine with gas and suction pipes as described in the findings, *supra,* constituted an infringement of claims 1, 3 and 4 of the Podlesak et al. patent in suit. The comments made above with respect to the absence of "pressing" in the Armour, Swiss Colony, and Jeffrey operations with the gas pipe machines are equally applicable to the Jeffrey operation with its gas and suction pipes machine. Also, the comments made above with respect to the fact that the preservative atmosphere was not released, in Jeffrey's operation of its gas pipe machine, at a point adjacent the point at which the sheet material was pressed against the units being packaged (assuming, for this purpose, that it was so pressed), as required by claims 5 and 6, are equally applicable to Jeffrey's operation of its gas and suction pipes ma-

chine. However, I find and conclude that the tube was formed, and its open end was situated at the apex of the V of the former, rather than at the fin sealer rolls. Thus, Jeffrey's operation of its gas and suction pipes machine included the release of the preservative atmosphere at a point inwardly of a plurality of the units disposed within the tube, as required by claim 3. In reaching the conclusion that claims 1, 3 and 4 were infringed, I am persuaded by the investigation by, and the testimony of, plaintiff's expert witness Villemonte with respect to the minimum amounts of preservative gas which it was necessary to introduce into the tube in order to achieve an oxygen content in the packages essentially below two per cent. I am persuaded that variations in the measurements and configuration of the model used by the witness Villemonte, on the one hand, and the machine actually used by Jeffrey, on the other hand, had no significant or practical effect upon the conclusions drawn. The operation by Jeffrey of its Hayssen RT–3 machine with gas and suction pipes as described in the findings, *supra*, did not constitute an infringement of claims 2, 5 and 6 of the Podlesak et al. patent in suit.

During the period from a time in 1963 until the time of trial of these consolidated actions, the operation by Armour of its Hayssen RT–3 machines with the gas manifold and suction pipe as described in the findings, *supra*, constituted an infringement of claim 1 of the Podlesak et al. patent in suit, but did not constitute an infringement of claims 2, 3, 4, 5 and 6 of said patent.

The comments made above with respect to the absence of "pressing" in the Armour, Swiss Colony, and Jeffrey operations with the gas pipe machines are equally applicable to the Armour operation of its Hayssen RT–3 machines with the gas manifold and suction pipe (claims 2, 5 and 6).

Each of the six claims requires an elongated tube having a single open end and formed of substantially gas impervious, flexible sheet material. Nothing in any of the six claims permits that the tube be formed in part of flexible sheet material and in part of plexiglass (plastic) or in part of cast metal. Therefore, the manifold was not a part of the tube. Plaintiff does not contend that a tube formed in part of flexible sheet material and in part of plexiglass or cast metal is an equivalent of a tube formed wholly of flexible sheet material, and I find and conclude that it is not such an equivalent.

The tube required by each of the six claims—namely, the tube formed of substantially gas impervious, flexible sheet material—was formed at, and its open end was situated at, the apex of the V of the former. The apex of the V of the former was situated at a point adjacent to the downstream end of the manifold. A substantial portion of the preservative gas released outside the tube from the orifices in the lower surface of the manifold was continuously introduced into the tube through the tube's open end. The gas was not released at a point in the tube inwardly of a plurality of cheese units disposed within the tube, as required by claim 3, nor was it released into the tube at a point between the point of tube formation and the point of tube collapse, as required by claim 4, nor was it released at a point adjacent the point at which the sheet material was pressed against the cheese units being packaged (assuming, for this purpose, that it was so pressed), as required by claims 5 and 6.

The sweeping action of the preservative gas which occurred upstream from the apex of the V of the former was not covered by any of the six claims of the patent.

The introduction of the preservative atmosphere into the tube and the collapsing of the tube, however, were effective to cause a portion of said preservative gas to pass over a plurality of units situated between the point at which the transverse seal was applied and the point at which the inlet end of the vacuum pipe was situated, and then to pass

out of the open end of the tube by passing within the suction pipe to a point upstream from and beyond the open end of the tube.

Perhaps the most intense controversy in these consolidated cases has been focussed on the nature and extent of the flow of the preservative atmosphere in the portion of the tube between the apex of the V of the former (the so-called point B of the exhibits) and the point at which the inlet end of the vacuum pipe was situated (the so-called point D of the exhibits). A plurality of cheese units were present between points B and D and preservative gas was clearly present there. Defendants contend that the movement of the gas between the said points B and D was wholly, or virtually wholly, downstream; that causing a portion of the gas to pass downstream over the units is not covered by the claims of the patent; and that even if it is within the letter of the claims of the patent, plaintiff is estopped from contending that it is so covered.

I have examined carefully the testimony and exhibits with respect to the nature and extent of the flow of the gas in the portion of the tube between points B and D. I am persuaded that the physical evidence is better explained by the investigation conducted by plaintiff's expert witness Villemonte and by his testimony than by the tests performed by, and testimony given by, the defendants' expert witnesses. The flow is complex. It is bi-directional, partially upstream and partially downstream. It includes movement of the gas in the spaces formed between the units of cheese in the tube. I appreciate that there were limitations upon the efficacy of the available methods of observation and measurement of the flow of the gas within the tube, and also that there were some variations in the measurements and configurations of models used by the witness Villemonte, on the one hand, and the machines actually used by the defendants, on the other hand. However, I am of the opinion that the said variations had no significant or practi-

cal effect upon the validity of the conclusions drawn. And I consider that the careful, empirical investigation conducted by the witness Villemonte, whatever the inherent limitations of the devices employed, was considerably more instructive than the comparatively simplistic analyses and tests offered by defendants' experts.

I find and conclude that in the operation by Armour of the Hayssen RT–3 machines with manifold and suction pipe, the introduction of the preservative atmosphere and the collapsing of the tube were effective to cause a portion of said preservative atmosphere to pass, both upstream and downstream, over a plurality of units in that portion of the tube between points B and D and then to pass out of the open end of the tube, and that this entire phenomenon, including the downstream passing, is covered by the language of the claims. That language clearly does not require that the gas pass upstream over the units. Although not necessary to a decision, I also conclude that operation by Armour of the Hayssen RT–3 machines, with manifold and suction pipe, with respect to the portion of the tube between points B and D, and the method disclosed and claimed in the Podlesak et al. patent, even if the latter is construed to call for the gas only to pass upstream over the units, perform the same function in substantially the same way to achieve substantially the same result. I also conclude that nothing in the history of the patent application or in the history of the litigation to enforce the patent estops the plaintiff here from asserting either that the claims literally cover the defendant's operation in this respect, or from asserting an equivalence. I also conclude that to apply the claims in the manner indicated is not to impair the added presumption of their validity afforded by the decision of the United States Court of Appeals for the Seventh Circuit. 394 F.2d 887.

During the period from a time in 1968 when Swiss Colony acquired a Hayssen RT–118 machine until the time of trial

of these consolidated actions, the operation by Swiss Colony of its Hayssen RT–118 machine, with the gas manifold and suction pipe as described in the findings, *supra*, constituted an infringement of claim 1 of the Podlesak et al. patent in suit, but did not constitute an infringement of claims 2, 3, 4, 5 and 6 of said patent.

All of the comments made above with respect to the operation by Armour of its RT–3 machines with the gas manifold and suction pipe are equally applicable to the operation by Swiss Colony of its Hayssen RT–118 machine with the gas manifold and suction pipe.

Defendant Jeffrey contends that plaintiff has been guilty of fraudulent conduct, in many respects, in the course of application for the patent in suit, in the course of the Eastern District litigation, in the course of pretrial procedures in this court in the present consolidated actions, and at trial in this court. The major contentions relate to an allegedly fraudulent concealment of Campbell patent 2,602,276 and to an allegedly fraudulent concealment of the facts relating to a pipe affixed to a Hudson-Sharp-Campbell machine some time prior to the reduction to practice of the invention of the patent in suit. The burden of proof is upon defendant Jeffrey with respect to these defenses. Defendant has failed utterly to prove that the absence of references to these two matters in the Patent Office proceedings, or the answer to the interrogatory in the Eastern District cases occurred with that knowledge and intent on the part of the plaintiff which are essential to fraud. I believe that Campbell 2,602,276 probably should have been a file wrapper reference, but I do not believe that its omission affected the action of the Patent Office, or the United States District Court for the Eastern District of Wisconsin, or the United States Court of Appeals for the Seventh Circuit. In the absence of further evidence from defendant Jeffrey, I am not persuaded that the answer to the interrogatory about the Hudson-Sharp-Campbell wrapper pipe was made with

knowledge of its falsity or with intent to deceive. As I have indicated earlier in this opinion, I do not consider the Hudson-Sharp-Campbell wrapper pipe episode significant with respect to the issue of obviousness or with respect to any other issue in this case. Jeffrey's affirmative defense, as pleaded and expanded in subsequent briefs and argument, must be denied.

█ I find and conclude that none of the infringements by any of defendants of the Podlesak et al. patent was conscious, deliberate or wilful. I entertain some doubt in this respect insofar as the Hayssen machines with the gas pipe and the Hayssen machines with the gas and suction pipes are concerned. I consider that the development and use of the manifold and suction pipe represented a serious effort to avoid infringement. In certain respects, infringement has been established at trial only by virtue of intensive and sophisticated testing and analysis.

I conclude that this is not an exceptional case under 35 U.S.C. § 285 warranting an award of attorneys' fees to plaintiff.